UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PETER LUDLOW, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 14 C 4614 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| NORTHWESTERN UNIVERSITY, ) | |
| ALAN CUBBAGE, individually, ) | |
| LAUREN LEYDON-HARDY, individually, ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

Northwestern University professor Peter Ludlow brings this suit against Defendants Northwestern University ("Northwestern"), Alan Cubbage, and Lauren Leydon-Hardy (collectively, "Defendants"). On February 5, 2015, the Court dismissed Ludlow's initial complaint. Ludlow has filed an Amended Complaint alleging that Northwestern's investigation of sexual harassment allegations against him violated Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq.*, and that Defendants' comments associated with the investigation defamed him and placed him in a false light. Defendants move to dismiss all claims [53, 55]. Defendants' motions are granted in part. Because Ludlow's Title IX claim is preempted by Title VII, and in any event Ludlow has not sufficiently pleaded that the alleged discrimination had any connection to his gender, the Title IX claim against Northwestern is dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over Ludlow's remaining state law claims. Therefore Counts II, III, IV, and V are dismissed without prejudice.

# BACKGROUND[1]

Peter Ludlow is a professor in the Philosophy Department at Northwestern. In February 2012, an undergraduate student at Northwestern made an internal complaint against Ludlow accusing him of inappropriate sexual advances and sexual assault. Northwestern's investigation concluded that the student's claim of sexual assault lacked credibility, but that Ludlow had violated the university's sexual harassment policy. Northwestern issued minor sanctions against Ludlow, but did not terminate his employment or bar him from teaching.

Ludlow and Leydon-Hardy had a consensual, romantic relationship from approximately October 2011 to January 2012. Leydon-Hardy was a graduate student during the relationship. But because Ludlow did not supervise her work, assess her grades, or have evaluative authority over her, Northwestern's policies did not prohibit the relationship. Ludlow states that Leydon-Hardy regularly sent him emails and text messages during the relationship expressing her affections for him.

On February 10, 2014, the initial complaining student filed a federal lawsuit against Northwestern alleging discrimination and retaliation in violation of Title IX related to her complaint against Ludlow. Ludlow contends that the undergraduate student used the threat of the lawsuit to gain academic advantages and when Northwestern would not pay her money or give her free tuition, she sued. On February 26, 2014, the student filed a state lawsuit against Ludlow for violation of the Gender Violence Act. Ludlow filed an answer to the student's lawsuit, adamantly denying the allegations.

These lawsuits received local and national media coverage. "Additionally, radical feminist and women's groups planned and held protests on campus and widely distributed calls

---

[1] The facts in the background section are taken from Ludlow's Amended Complaint and are presumed true for the purpose of resolving the Defendants' motions to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

for [Ludlow's] termination." Am. Compl. ¶ 10. A national Title IX-focused women's group met with Northwestern community members "and assisted in planning actions against" Ludlow. *Id.* "Many of these protestors accused Defendant Northwestern of supporting a culture of rape and failing to support its female students by failing to 'believe the victims.'" *Id.*

On March 4, 2012, one of the groups protesting Ludlow's employment planned a disruption of Ludlow's classes. In consultation with Northwestern, Ludlow cancelled the class and it was decided that, due to further protests and planned disruptions, another professor would give the final course lectures while Ludlow continued with his grading and supervising responsibilities.

On or about March 11, 2014, Stephanie Graham, Northwestern's legal counsel, asked Ludlow's attorney if Ludlow would agree not to teach any classes during the spring quarter. Graham stated that Northwestern would not remove Ludlow from teaching without his consent and that Ludlow would continue his research, writing, and advising—the bulk of his professional responsibilities—and be paid. As part of this agreement and to avoid further media attention, Ludlow's attorney asked Northwestern to agree not to comment on the decision other than to say, "Professor Ludlow is not teaching spring quarter." *Id.* ¶ 13. Graham agreed. Based on these representations, Ludlow agreed not to teach in the spring quarter.

However, around March 12, Northwestern and Cubbage, Vice President of University Relations for Northwestern, made statements to students and the media that Ludlow alleges were motivated by the desire for positive public relations and that falsely represented that Ludlow was removed from teaching in the spring quarter "at the behest of the protestors and to punish" him. *Id.* ¶ 15. Ludlow further alleges that Northwestern and Cubbage intended that these statements, in the context of the protest and media coverage of the undergraduate's complaints, suggest that

Northwestern was punishing Ludlow in response to the protests when in fact Northwestern had taken no punitive action against him.

On March 12, 2014, Cubbage told *NBC Chicago* reporters that Northwestern had placed Ludlow on a "leave of absence." *Id.* ¶ 17. *NBC Chicago* published that information in an article titled "Accused NU Prof Won't Teach Next Quarter." *Id.* Cubbage later corrected his statement about the leave of absence, explaining, "It turns out Prof. Ludlow is not on a leave of absence . . ." *Id.* Ludlow alleges that statement "lacks any substantial truth" because he was still researching and writing. *Id.* ¶ 18. Ludlow pleads that Northwestern's Faculty Manual states:

> A leave of absence releases a faculty member from on-campus teaching and service responsibilities for a specified period of time . . . . A faculty member is not considered to be on leave during a term in which he/she happens not to have any scheduled classroom responsibilities but maintains all educational and service responsibilities, such as advising, departmental administration, committee assignments, and other forms of service. Such a faculty member is considered to be "in residence."

*Id.* ¶ 19.

Several days after the undergraduate filed suit against Northwestern, Leydon-Hardy told her academic advisor that Ludlow had non-consensual sex with her on one occasion while they were dating. Ludlow pleads that Leydon-Hardy knew this statement was not true.

In March 2014, Leydon-Hardy's academic advisor told Northwestern of Leydon-Hardy's allegation against Ludlow. After this, Leydon-Hardy told Northwestern officials, including Joan Slavin and Graham, that Ludlow had non-consensual sex with her. Ludlow pleads that this statement was false.

Upon receiving this complaint, Northwestern retained a third-party, Patricia Bobb, to investigate the claims. Ludlow provided Bobb evidence about his whereabouts on the night in question and positive communications between Leydon-Hardy and himself after that. Ludlow

4

states that Leydon-Hardy repeated the false allegation of non-consensual sex to Bobb but when asked about the positive text messages the day after the alleged encounter, agreed that she continued her sexual relationship with Ludlow after that night. Ludlow pleads that during the investigation, Bobb gave Leydon-Hardy "many advantages that she did not extend" to Ludlow. *Id.* ¶ 28. "[Bobb] did this because Ms. Leydon-Hardy is a woman, and following the 'believe the victims' mantra, entitled to more opportunities to construct her case." *Id.* As an example, Bobb forwarded to Leydon-Hardy, without Ludlow's permission, confidential emails and allowed Leydon-Hardy to refute those emails. Bobb did not do the same for Ludlow and refused to tell Ludlow the details of Leydon-Hardy's specific allegations against him, depriving Ludlow of the ability to fully respond. When Bobb did not have evidence of non-consensual sex, she investigated other charges without notifying Ludlow of the nature of the new charges. These new charges included that Ludlow had a supervisory role in respect to Leydon-Hardy and that he had sexually harassed Leydon-Hardy.

Bobb ultimately found insufficient evidence to support the claim of non-consensual sex. Because Ludlow did not have evaluative authority over Leydon-Hardy, Bobb found Ludlow did not violate Northwestern's policy prohibiting professors from dating students. However, Bobb did find that Ludlow violated Northwestern's policy against sexual harassment because he had unequal power in the relationship based on his purchase of expensive dinners for Leydon-Hardy and the exercise of his "charm." *Id.* ¶ 32.

Although Ludlow alerted Northwestern that Bobb's conclusions were flawed and unsupported, the report was distributed to "a number of people," including Dean Mangelsdorf, and Provost Linzer.

5

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I. Title IX (Count I)

#### A. Title VII Preemption

In ruling on Defendants' initial motions to dismiss,[2] the Court declined to find that Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, preempted Ludlow's Title IX claim because Ludlow affirmatively disavowed that he was bringing an employment discrimination claim and his Complaint did not allege an adverse employment action and left open the possibility that his damages were related to future endeavors. *See* February 2, 2015 Opinion and Order ("Opinion") at 11–12. With this motion, Defendants Northwestern and Cubbage renew their argument that Ludlow's Title IX claim clearly arises out of his employment

---

[2] Defendants Northwestern, Cubbage, and Leydon-Hardy were parties to the first round of motions to dismiss [Docs. 27 & 29]. Ludlow did not name the other original defendants in his Amended Complaint.

and is therefore preempted by Title VII. Ludlow again responds that his claim is based on the allegedly flawed investigation and is not an employment action. However, Ludlow also argues that he has pleaded a materially adverse employment action sufficient to sustain a Title IX claim. In light of this and the facts as pleaded in the Amended Complaint, the Court finds that Ludlow is bringing an employment discrimination claim that is preempted by Title VII and dismisses Count I with prejudice.

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance."[3] 20 U.S.C. § 1681(a). The Supreme Court has found an implied private right of action in Title IX, with private parties authorized to seek monetary damages for intentional violations. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173, 125 S. Ct. 1497, 161 L. Ed. 2d 361 (2005) (*citing Cannon v. Univ. of Chicago*, 441 U.S. 677, 690–93, 99 S. Ct. 1946, 60 L. Ed. 2d 560 (1979)). Student claims of sexual harassment by teachers or other students are well-established examples of such suits. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290–91, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998) (by a teacher); *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 643, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999) (by a fellow student). Employees of institutions receiving federal financial assistance may also bring private right of action suits, although the boundaries of those claims are less well-defined. *See, e.g.*, *Jackson*, 544 U.S. at 184 (finding Title IX allowed retaliation suit by coach who complained about sex discrimination in athletics resources at his high school).

---

[3] For convenience and the sake of judicial efficiency, the Court will repeat some of its analysis of Title IX preemption law from its initial Opinion.

Northwestern and Cubbage argue that Title VII preempts employment discrimination claims brought under Title IX, citing *Lakoshi v. James*, 66 F.3d 751, 755 (5th Cir. 1995), and *Waid v. Merrill Area Public Schools*, 91 F.3d 857, 861–62 (7th Cir. 1996). In *Lakoshi*, the Fifth Circuit, after extensive legislative history analysis, concluded that Congress did not intend to create a private right of action for employment discrimination under Title IX. 66 F.3d at 757 ("Title VII provided *individuals* with administrative and judicial redress for employment discrimination, while Title IX empowered *federal agencies* that provided funds to educational institutions to terminate that funding upon the finding of employment discrimination. In other words, Congress intended to bolster the enforcement of the pre-existing Title VII prohibition of sex discrimination in federally funded educational institutions; Congress did not intend Title IX to create a mechanism by which individuals could circumvent the pre-existing Title VII remedies."). In *Waid*, the Seventh Circuit examined the case of a teacher who, denied a full-time teaching position, sought and won a state administrative agency claim for sex discrimination. 91 F.3d at 860. She then filed suit in federal court, asserting a Title IX violation and individual § 1983 equal protection claims against the school administrators. *Id.* In considering whether preemption applied to any of her claims, the Court explained that Waid's success with the state administrative agency satisfied any claim she might have had under Title VII. *Id.* at 862. Waid's claim arose before the amendments to Title VII allowed for more than equitable relief. *Id.* The Court therefore, citing *Lakoshi* among other cases, determined that Title VII preempted any of her claims for equitable relief under Title IX. *Id.* ("It is well-established that Title VII's own remedial mechanisms are the only ones available to protect the rights created by Title VII.").[4]

---

[4] The *Waid* court went on to determine that Title IX preempted § 1983 intentional discrimination claims. 91 F.3d at 863. The Supreme Court abrogated that portion of *Waid*'s holding without discussing the

8

Although *Waid* dealt only with a claim for equitable relief (because that was all that was available to Ms. Waid under the statute at the time her claim arose), other courts in this district have interpreted *Waid* as holding that Title VII preempts any Title IX employment discrimination suit. *See Jones v. Sabis Educ. Sys., Inc.*, No. 98 C 4252, 1999 WL 1206955, at *10 n.7 (N.D. Ill. Dec. 13, 1999) (finding Title VII preempted Title IX wrongful discharge claim); *Kowal-Vern v. Loyola Univ. of Chicago,* No. 97 C 6409, 2002 WL 1880131, at *5 (N.D. Ill. Aug. 14, 2002) ("Title VII is the exclusive remedy for [the plaintiff's] claim of employment discrimination based on gender."); *Blazquez v. Bd. of Educ. of City of Chicago*, No. 05 CV 4389, 2006 WL 3320538, at *11 (N.D. Ill. Nov. 14, 2005) ("While the overall scope of Plaintiff's claims might seem more appropriately addressed as a systemic educational problem under Title IX, this particular claim [failure to provide a teacher's aide] is based upon the harassment Plaintiff herself suffered. There is therefore no reason to look beyond the comprehensive scope of remedies and actions available to Plaintiff under Title VII."). In finding preemption, these courts "express[] concern that by allowing a comparable cause of action under Title IX the very comprehensive, detailed, and express provisions of Title VII could be completely avoided," and explain that Congress did not intend that Title IX "serve as an additional protection against gender-based discrimination regardless of the available remedies under Title VII." *See Howard v. Bd. of Educ. of Sycamore Cmty. Unit Sch. Dist. No. 427*, 893 F. Supp. 808, 815 (N.D. Ill. 1995) (citation omitted) (internal quotation marks omitted).

Ludlow cites cases in other Circuits that have found a private right of action for employment discrimination under Title IX. *See, e.g., Preston v. Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203, 205–06 (4th Cir. 1994); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881,

---

interplay of Title VII and Title IX. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009).

897 (1st Cir. 1988). He also refers the Court to the Department of Justice Civil Rights Division's Title IX Manual giving the Department's position that Title VII and Title IX are "separate enforcement mechanisms" and "[i]ndividuals can use both statutes to attack the same violations." Resp. at 9–10. While this may be the Department's position, a policy manual is not entitled to *Chevron*-style deference, but rather "respect . . . but only to the extent that those interpretations have the power to persuade." *See Christensen v. Harris County*, 529 U.S. 576, 587, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000) (citation omitted) (internal quotation marks omitted).[5] The Manual as quoted by Ludlow further states: "This view is consistent with the Supreme Court's decisions on Title IX's coverage of employment discrimination, as well as the different constitutional bases for Title IX and Title VII." Resp. at 9. This brief summation does not give the Court any basis to go beyond its sister district courts' uniform findings that employment discrimination claims under Title IX are preempted by Title VII under *Waid*.

Therefore, as the Court stated in its earlier Opinion, if Ludlow were alleging some form of employment discrimination, his claim would be preempted by Title VII. With his Amended Complaint and response to this motion, it is clear that Ludlow has alleged an employment discrimination-based Title IX claim. Although this is not the typical Title IX employment discrimination case in which a teacher alleges a failure to promote or termination, as discussed in the Opinion, the 2014 investigation into Leydon-Hardy's allegation of non-consensual sex was conducted because of Ludlow's position as a professor at Northwestern. The investigation's finding of sexual harassment was based on his status as a professor with "unequal power" over a

---

[5] Ludlow's citation to *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944) does not compel the Court to defer to this manual in contravention of the Supreme Court's clear direction on this issue in *Christensen*. *See Wolpaw v. C.I.R.*, 47 F.3d 787, 790–91 (6th Cir. 1995) (explaining the evolution of judicial deference to agency interpretation of regulations, citing *Skidmore* as the first articulation of the doctrine that would evolve into *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)).

graduate student with whom he had a relationship. Ludlow would not be subject to Northwestern's sexual harassment policies and procedures but for his job there. These factors point to his claim stemming from his employment.

Furthermore, Ludlow asserts as specified damages "professional and personal emotional distress, humiliation, embarrassment and future lost income and benefits." Am. Compl. ¶ 41. Although in the Opinion the Court found that the similar, vague claims of damages, including "future lost income and benefits," could possibly be attributed to something outside his work at Northwestern, Opinion at 12, Ludlow has now affirmatively argued that those damages are a materially adverse employment action under Title IX that can be classified as "changes to the employee's work conditions" and "employee's future career prospects," Resp. at 7 ("In this case, [Ludlow] has alleged facts which would fall under categories 2 and 3 [of the materially adverse employment action standard] above. First, he alleged that he suffered professional and personal emotional distress, humiliation, embarrassment and then he alleged that he has lost future income and benefits."). Ludlow's Title IX claim is one for employment discrimination and therefore preempted under Title VII and dismissed with prejudice.

### B. Failure to State a Claim

However, even if Ludlow's Title IX claim was not preempted, the Amended Complaint would again fail to state a claim for sex discrimination under Title IX because Ludlow has not sufficiently pleaded that the alleged problems with Northwestern's investigation were based on his gender.

As discussed in the Opinion, Ludlow has presented a novel Tile IX claim that in some respects parallels recent student suits attacking universities' disciplinary procedures. *See, e.g.*, *Doe v. Columbia Univ.*, --- F. Supp. 3d ----, 2015 WL 1840402, at *1 (S.D.N.Y. Apr. 21, 2015).

Ludlow does not plead that Northwestern's sexual harassment procedures are systemically flawed—rather he alleges that Northwestern intentionally denied him "a partial and unbiased investigation" "as a result of [] outside pressure from radical women's groups." Am. Compl. ¶ 38. Ludlow further pleads that he was denied a "non-discriminatory investigation based on the fact that he was a male and [Northwestern] needed to 'believe the victim.'" *Id.* ¶ 39. Ludlow cites as examples of these unfair procedures Northwestern's failure to consider evidence in his favor, how Leydon-Hardy was treated during the investigation, refusal to discuss the full nature of the charges against him, "and ultimately . . . interpreting perfectly appropriate male behavior (e.g. being 'charming') as an episode of sexual harassment." *Id.* Ludlow also disagrees with the "flawed and legally unsupported nature of" the conclusion that he violated Northwestern's sexual harassment policy because "he had established 'unequal power' by buying [Leydon-Hardy] 'expensive dinners' and exercising his 'charm.'" *Id.* ¶ 32.

Ludlow's claim is essentially that the investigation was biased against him because he is a man and was motivated by Northwestern's desire to placate outside political interests and end bad publicity created by the undergraduate's lawsuit, and that its conclusions were flawed. As in the last round of briefing, Ludlow does not point the Court to any cases that would support this use of Title IX to attack the outcome of a single internal investigation of an employee and the Court could find none. But even if the Court were to interpret Title IX's private right of action broadly enough to encompass Ludlow's claim that the investigation and its findings constitute a violation, Ludlow's Complaint fails to state a claim for sex discrimination.

To sufficiently plead Title IX sex discrimination, Ludlow must allege: 1) that he "was excluded from participation in or denied benefits of or subjected to discrimination in an educational program; 2) that receives federal financial assistance; and 3) that the exclusion was

on basis of sex, i.e., gender." *See Torrespico v. Columbia Coll.*, No. 97 C 8881, 1998 WL 703450, at *17 (N.D. Ill. Sept. 30, 1998). Cases challenging university disciplinary procedures generally proceed under either an innocence theory, i.e. that he was wrongly found to have committed the offense, or a selective enforcement theory, i.e. that regardless of guilt or innocence, "the severity of the penalty and/or the decision to initiate the proceeding was affected by the [plaintiff's] gender." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). Ludlow seems to rely on both theories.

Although Ludlow "need not plead specific facts under notice pleading requirements, he must provide either facts or conclusory allegations sufficient to put [Northwestern] on notice of his claim and from which the Court can infer that he has a cause of action." *Torrespico*, 1998 WL 703450, at *18. Ludlow must provide some allegations to allow the Court to infer a causal connection between his treatment and gender bias and raise the possibility of relief under Title IX above the speculative level. *See Blank v. Knox Coll.*, No. 14-cv-1386, 2015 WL 328602, at *3 (C.D. Ill. Jan. 26, 2015) (dismissing flawed investigation Title IX claim).

Taking everything in the Amended Complaint as true, Ludlow has not pleaded sufficient facts to allow the Court to conclude that his sex caused the allegedly erroneous finding of sexual harassment or motivated the investigation into Leydon-Hardy's allegation. *See Blank*, 2015 WL 328602, at *3–4 (allegations that board disregarded plaintiff's witnesses and would not let plaintiff question absent witnesses were not pleaded as based on plaintiff's gender); *Columbia Univ.*, 2015 WL 1840402, at *10–16 (dismissing claim because plaintiff failed to allege any "*factual* allegations that give rise to a plausible inference that Plaintiff was mistreated because of (rather than in spite of) his sex").

13

Ludlow does not state any allegations that would support the inference that gender bias was a motivating factor in the sexual harassment finding. Ludlow pleads that Northwestern's procedures were biased in favor of the victim and that "perfectly normal male behavior" was misinterpreted and penalized. Asserting that he was denied fair procedures during the investigation "because he is male" is the kind of conclusory statement that courts reject as insufficient to plead this claim. *See Columbia Univ.*, 2015 WL 1840402, at *11 (dismissing Title IX claim based on assertion that university and investigator's actions "were based on an anti-male basis"); *Blank*, 2015 WL 328602, at *4 (dismissing Title IX claim based on "mere label or legal conclusion" of gender bias). Indeed, alleging that Northwestern treated him, as a male, differently from the female victim is insufficient to establish a Title IX claim:

> And while [the university] may well have treated Jane Doe more favorably than Plaintiff during the disciplinary process, the mere fact that Plaintiff is male and Jane Doe is female does not suggest that the disparate treatment was *because of* Plaintiff's sex. Indeed the alleged treatment could equally have been—and more plausibly was—prompted by lawful, independent goals, such as a desire (enhanced, perhaps, by the fear of negative publicity or Title IX liability to the victims of sexual assault) to take allegations of rape on campus seriously and to treat complainants with a high degree of sensitivity. In other words, the disparate treatment of Plaintiff and Jane Doe is merely consistent with the defendants' liability, and hardly establishes a plausible inference of discrimination.

*Columbia Univ.*, 2015 WL 1840402, at *12 (citations omitted) (internal quotation marks omitted). Ludlow's allegation that Northwestern "needed to believe the victim" similarly points to a victim-focused procedure by Northwestern, not a procedure that took the gender of the victim and the accused into account. Ludlow pleads none of the indicators that the informative Second Circuit case *Yusuf* suggests would be sufficient to show gender bias as a motivating factor in a disciplinary decision, i.e. "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.* at *11 (quoting *Yusuf*, 35 F.3d at 715). That Ludlow is male is a

conclusion without any link to the investigation itself and his statement that Northwestern "needed to believe the victim" does not sustain the inference that Northwestern took the genders of the victim and accused into account.

Similarly, Ludlow offers nothing but conclusions for his selective enforcement theory. Ludlow states that Northwestern investigated him for the alleged non-consensual sex and then found he violated its sexual harassment policy "as a result of [this] outside pressure from radical women's groups." Am. Compl. ¶ 38. However, alleging that the Northwestern investigation was a result of outside pressure groups does not create the plausible inference—even if those groups were women's groups—that Northwestern investigated because Ludlow was a man, not because the charge was rape. Ludlow does not make any allegation that a female employee would have been treated more favorably in the same circumstance. As the court in *Columbia University* acknowledged, inadequate procedural protections in these kinds of disciplinary hearings may have the effect of burdening men more than women because of the higher incidence of female complaints of sexual misconduct against males. *Columbia Univ.*, 2015 WL 1840402, at *15. However, Title IX does not create a private right of action for disparate impact cases. *Id.* Ludlow must plead intentional discrimination because of his sex. *Id.* Because he has not done that, he fails to state a claim for Title IX gender discrimination. *Id.* (explaining the plaintiff must allege something more, for example, "comparisons to accounts of other accused students; allegations that similarly situated women are or even men would be treated differently; or, at a minimum, data showing that women rarely, if ever, are accused of sexual harassment, coupled perhaps with evidence that women accused of other [university] rules violations are treated differently than men are" (internal quotation marks omitted)).

15

Ludlow's allegations that the investigation was flawed and biased are not connected in any way to his sex and are wholly conclusory, and therefore do not meet the Rule 8 pleading requirements. *See Iqbal*, 556 U.S. at 678. Even if Ludlow's Title IX claim was not preempted by Title VII, Count I would be dismissed with prejudice.

## II. Jurisdiction Over the Remaining State Law Claims

The Court must determine whether it has subject matter jurisdiction over Ludlow's remaining state law tort claims (Counts II–V). Ludlow pleads jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and § 1367 (supplemental jurisdiction). With dismissal of the Title IX claim, however, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims unless diversity jurisdiction exists. 28 U.S.C. § 1367(c) (district court may decline to exercise supplemental jurisdiction over state law claims when it has dismissed all claims over which it had original jurisdiction). Ludlow does not plead diversity jurisdiction—indeed, he does not put forward an amount in controversy and, although Leydon-Hardy is alleged to be a citizen of Massachusetts, there is not complete diversity since Ludlow, Cubbage, and Northwestern are alleged to be citizens of Illinois. *See* 28 U.S.C. § 1332 (district courts have jurisdiction over state law claims where the amount in controversy exceeds $75,000 and the plaintiff and defendants are citizens of different states); *Howell v. Tribune Entm't Co.*, 106 F.3d 215, 217 (7th Cir. 1997) (complete diversity means that "none of the parties on either side of the litigation may be a citizen of a state of which a party on the other side is a citizen"). Although the citizenship of the parties may differ from the allegations of the Amended Complaint, the Court cannot proceed on the assumption that diversity jurisdiction exists. *See Downs v. IndyMac Mortg. Servs., FSB*, 560 F. App'x 589, 591 (7th Cir. 2014) (refusing to find diversity jurisdiction when it was not pleaded).

As for supplemental jurisdiction under 28 U.S.C. § 1367, it is "the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). However, this Court should consider, at every stage of the litigation, whether supplemental jurisdiction serves "the values of judicial economy, convenience, fairness, and comity," *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173, 118 S. Ct. 523, 139 L. Ed. 2d 525 (1997). The Court should retain jurisdiction when significant judicial resources have been expended on resolution of the supplemental claim such that relinquishing jurisdiction would cause substantial duplication of effort, where it is obvious how the claims should be decided, or where the statute of limitations would bar refiling of the claims in state court. *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). Although this Court already addressed state law claims against these Defendants in the initial motion to dismiss Opinion, the case has not progressed so far that relinquishing jurisdiction would cause substantial hardship in terms of duplication of efforts for the parties. And in reviewing the arguments on the motions to dismiss, the Court finds some complex questions of state law and has determined that it is not obvious how the claims should be decided.

Therefore, without another basis of jurisdiction, the Court declines to exercise supplemental jurisdiction over Ludlow's state law claims and dismisses them without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants Northwestern, Cubbage, and Leydon-Hardy's motions to dismiss [53, 55] are granted in part. Count I against Northwestern and Cubbage is dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over Counts II–V and dismisses those claims without prejudice. Civil case terminated.

Dated: August 28, 2015

SARA L. ELLIS
United States DistriAugust 28, 2015